**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CASEY MATTINGLY,

        Plaintiff,

v.                                  Case No. 3:14-cv-591-J-32JBT

DANA BARNES, et al.,

        Defendants.

_____

## ORDER

### I. Status

Plaintiff was a pretrial detainee at the Duval County Jail when he initiated this case.[1]

He is proceeding on a pro se Third Amended Complaint (Doc. 22) pursuant to 42 U.S.C.

§ 1983.[2] He claims that Defendants Dana Barnes, M.D.; Linda Richo, N.P.; and Sohail Khan,

P.A. violated his constitutional rights when they were deliberately indifferent to his serious

medical needs while he was housed at the jail.[3]

Before the Court are Motions for Summary Judgment filed by Defendant Khan (Doc.

70) and Defendants Barnes and Richo (Doc. 71). Defendants filed Joint Exhibits (Doc. 72).

The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure

_____

[1] Plaintiff was subsequently convicted in state court and is currently housed in the Florida Department of Corrections.

[2] Plaintiff attached exhibits to his Third Amended Complaint; he also separately filed exhibits (Docs. 37, 44, 48).

[3] Plaintiff also named John Rutherford as a Defendant. The claims against Defendant Rutherford were dismissed on October 20, 2016. See Order (Doc. 55).

56, and notified him that the granting of a motion for summary judgment may foreclose subsequent litigation on the matter. See Order (Doc. 24). Plaintiff filed a consolidated Response (Doc. 76) with Exhibits and a Declaration (Doc. 77). Defendants Barnes and Richo filed a Reply (Doc. 81), and Plaintiff filed a Sur-Reply (Doc. 82).[4] The Summary Judgment Motions are ripe for review.

## II. Plaintiff's Third Amended Complaint

On May 9, 2013, Plaintiff slipped and fell in the Duval County Jail. He suffered a "Lisfranc Injury." He was seen by physicians at UF Health,[5] who "recommended numerous treatments to Dr. Dana Barnes[] on numerous occasions," such as "pain management, physical therapy, repa[]rative surgery, nerve blocks, and pain medication." However, Defendant "Barnes refused to allow the Plaintiff to receive any of the treatments until[] UF Health Physicians fought for them." According to Plaintiff, Defendant Barnes considered the recommended treatments "elective" and "stated that JSO [(Jacksonville Sheriff's Office)] would not pay for them." She also "refused to administer narcotic pain medication from the onset of the injury until[] the Plaintiff's leg was amputated and it was no longer needed."

In April 2014, Defendant Khan "took the Plaintiff's crutches from him and told him to 'crawl his ass back to his dorm.'" Plaintiff alleges that Defendant Khan "threatened to taze the Plaintiff if he didn't comply." Defendant "Khan refused to issue prescribe[d] medication from UF Health and told other nurses to avoid talking with the Plaintiff." Defendant "Richo

---

[4] Given the expansive record, citations to the parties' filings are to the document and page numbers as assigned by the Court's electronic case filing system.

[5] UF Health Jacksonville was formerly known as Shands Jacksonville. See Doc. 72-3 at 2. The Court uses UF Health and Shands interchangeably.

refused to issue prescribed medication from UF Health, and has told the Plaintiff that she would not refer him for speciality consultation."

Plaintiff claims that he "was suffering from Reflex Sympathy Dystrophy, a secondary and serious condition em[]anating from the Defendants' neglect and deliberate indifference of the Plaintiff's Lisfranc Injury." According to Plaintiff, the Defendants were deliberately indifferent by "refusing him medically necessary therapies[ and] narcotic medication," and "at points [were] hostile to the Plaintiff." He states that as a result of the Defendants' actions and inactions, his left leg was amputated "in order for him to gain some quality of life and mobility." Plaintiff seeks monetary damages against each Defendant.

### III. Parties' Summary Judgment Positions

Generally, Defendants argue that they were not deliberately indifferent to Plaintiff's serious medical needs and they are entitled to qualified immunity. They contend that Plaintiff consistently received adequate medical care and treatment at the jail, Florida State Hospital, and UF Health. Defendants filed the following exhibits in support of their positions: (1) the transcript of Plaintiff's deposition (Doc. 72-1 at 1-383) (Pl. Dep.) with exhibits (Doc. 72-1 at 384-482 to Doc. 72-2 at 1-104); (2) large portions of Plaintiff's medical records from the jail, UF Health, and Florida State Hospital (Doc. 72-3 to Doc. 72-6); (3) declarations from Defendant Barnes (Doc. 72-8 at 2-7) with exhibits (Doc. 72-8 at 9-38); Defendant Richo (Doc. 72-7 at 2-3) with exhibits (Doc. 72-7 at 5-26); Defendant Khan with exhibits (Doc. 72-11 and Doc. 72-12); Tara Wildes, the former Director of Corrections for the Jacksonville Sheriff's Office (Doc. 72-10); Dr. Chaim Rogozinski, a board certified orthopedic surgeon (Doc. 72-13); and Dr. Alan Abrams, a medical doctor and psychiatrist (Doc. 72-14); (4) a

3

deposition transcript of Patricia Kalu, an RNP at Florida State Hospital (Doc. 72-9 at 2-14) with exhibits (Doc. 72-9 at 25-31); and (5) a demonstrative calendar reflecting the day-by-day care Plaintiff received from the date of his injury (May 9, 2013) to after his amputation (March 2015) (Doc. 72-15). According to Plaintiff, the record evidence shows that Defendants were deliberately indifferent to his serious medical needs resulting in unnecessary pain and ultimately, a below-the-knee amputation of his left leg.

### IV.  Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" <u>Hinkle v. Midland Credit Mgmt., Inc.</u>, 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting <u>Jurich v. Compass Marine, Inc.</u>, 764 F.3d 1302, 1304 (11th Cir. 2014)); <u>see</u> Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Bowen v. Manheim Remarketing, Inc.</u>, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted).

> If the movant satisfies the burden of production showing that there is no genuine issue of fact, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." <u>Shiver v. Chertoff</u>, 549 F.3d 1342, 1343 (11th Cir. 2008) (quotation omitted). [The Court] draw[s] "all factual inferences in a light most favorable to the non-moving party." <u>Id.</u>

<u>Winborn v. Supreme Beverage Co. Inc.</u>, 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote and

citation omitted). "'A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.'" Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990) (internal quotations omitted)).

## V. Deliberate Indifference Under 42 U.S.C. § 1983

"To prevail on [a] § 1983 claim for inadequate medical treatment, [the plaintiff] must show (1) a serious medical need; (2) the health care providers' deliberate indifference to that need; and (3) causation between the health care providers' indifference and [the plaintiff's] injury." Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 (11th Cir. 2017) (citation omitted).[6]

> A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (quotations and citation omitted).

---

[6] Plaintiff's claims are properly analyzed under the Fourteenth Amendment rather than the Eighth Amendment because he was a pretrial detainee at the time of the alleged wrongdoing. See Dang, 871 F.3d at 1279 ("As a pretrial detainee, Dang alleges inadequate medical care under the Fourteenth Amendment rather than the Eighth Amendment." (citation omitted)). Nevertheless, Plaintiff's claims are "'subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment.'" Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009)); see Dang, 871 F.3d at 1279 ("Dang's claims are evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment." (citation omitted)).

Deliberate indifference to a serious medical need requires "three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (citations omitted); see Dang, 871 F.3d at 1280; Melton, 841 F.3d at 1223 & n.2. "Subjective knowledge of the risk requires that the defendant be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Dang, 871 F.3d at 1280 (quoting Caldwell v. Warden, FCI Talladega, 784 F.3d 1090, 1099-1100 (11th Cir. 2014)).

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe Cty., Ala., 116 F.3d 1419, 1425 (11th Cir. 1997), overruled on other grounds by LeFrere v. Quezada, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. See Harris v. Coweta Cty., 21 F.3d 388, 393-94 (11th Cir. 1994) (citing Brown v. Hughes, 894 F.2d 1533, 1537-39 (11th Cir. 1990)).[7] Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

---

[7] "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation omitted). However, "[i]t is also true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (citing Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir.1985)); see Boone v. Gaxiola, 665 F. App'x 772, 774 (11th Cir. 2016).

> intolerable to fundamental fairness." <u>Rogers v. Evans</u>, 792 F.2d
> 1052, 1058 (11th Cir. 1986) (citation omitted).

<u>Dang</u>, 871 F.3d at 1280. "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew].'" <u>Id.</u> (quoting <u>Burnette v. Taylor</u>, 533 F.3d 1325, 1331 (11th Cir. 2008)).

## VI. Analysis

No party disputes that Plaintiff had a serious medical need. The only question then is whether Defendants were deliberately indifferent to that need. The Court considers Plaintiff's claims as to each Defendant.

Before doing so, however, the Court addresses a consistent theme throughout Plaintiff's deposition: his contention that the medical records are inaccurate. Plaintiff has not presented any evidence that these records were fabricated in any way, and "[s]elf-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." <u>Whitehead v. Burnside</u>, 403 F. App'x 401, 403 (11th Cir. 2010) (citing <u>Bennett v. Parker</u>, 898 F.2d 1530 (11th Cir. 1990)); <u>see generally Kingsland v. City of Miami</u>, 382 F.3d 1220, 1227 n.8 (11th Cir. 2004) ("[A] court need not entertain conclusory and unsubstantiated allegations of fabrication of evidence." (citation omitted)). Regardless, these "disputes" are not material for purposes of resolving the Summary Judgment Motions.

### A. Defendant Barnes

Plaintiff alleges that Defendant Barnes "refused to administer narcotic pain medication" and "refused to allow the Plaintiff to receive any of the treatments until[] UF

Health Physicians fought for them," because Defendant Barnes considered them "elective treatments" for which "JSO would not pay." During his deposition, Plaintiff summarized his claims against Defendant Barnes.

> My claim against Dr. Barnes is that she refused for the physical therapy initially. She refused the nerve block initially.
>
> She refused the neurology consult, an ortho consult, I believe a podiatry consult. There was four different times that -- three or four different times. I think one of them was a double entry. . . .
>
> [T]he fact that she refused to give me medication that would help actually combat my pain, actually reduce my pain and put me in a state where, "Okay, I can function and live with this as normally as possible," that's a claim against her. Those are all of my claims against her.

Pl. Dep. (Doc. 72-1) at 328; see also id. at 329-30.

Defendant Barnes submitted the following Declaration.

> My name is Dana Barnes. I am a defendant in the above-styled action. I have been a Florida-licensed medical doctor since 2008 and Board-certified in family medicine since 2011. I am the physician in charge of medical care and treatment at the John E. Goode Pre-Trial Detention Facility, and have been in this role since 2011.
>
> I have personal knowledge of Casey Mattingly's injury to his left foot, and the medical treatment that was provided to him for his injury between 2013 and 2015.
>
> I personally saw Mr. Mattingly in the PTDF medical clinic on numerous occasions.
>
> . . . .
>
> My first encounter with Mr. Mattingly after his incarceration at PTDF was on May 22, 2012. Mr. Mattingly was in self-harm at the time recovering from a reported overdose and drug withdrawal. Mr. Mattingly told me that he heavily

8

abused MDMA (commonly referred to as Ecstasy or Molly) and benzodiazepines (commonly referred to as Xanax or Valium). Mr. Mattingly also told me that he abused opiates that had originally been prescribed to him for chronic pain.

After the injury to his left foot in May 2013, my medical staff promptly sent him to the UF Health Emergency Department for evaluation, and subsequently referred Mr. Mattingly to UF Health Orthopedics and UF Health Podiatry.

Between May 2013 [and] his admission to UF Health for his amputation in 2015, Mr. Mattingly was transported from the PTDF to UF Health on dozens of occasions for X-rays, physical therapy, and treatment and evaluation by orthopedics, neurology, pain management, and podiatry.

On July 30, 2013, Mr. Mattingly was seen by UF Health Podiatry and diagnosed with CRPS,[8] a diagnosis which was found to be incorrect. The treating physician, a resident in podiatry, recommended that Mr. Mattingly begin physical therapy and also be evaluated by the UF Health Neurology Department. I referred Mr. Mattingly to physical therapy, but at that time, in my professional opinion, a neurology consultation was not warranted given that the injury was so recent and was expected to improve with physical therapy. However, less than one month later, on August 20, 2013, I decided to refer Mr. Mattingly to UF Health Neurology. Mr. Mattingly was in fact seen by UF Health Neurology on September 16, 2013.

On September 11, 2013, I examined Mr. Mattingly in the PTDF medical clinic, and I referred him back to UF Health Podiatry noting that repeat imaging should be considered given that the injury was not getting any better.

On September 17, 2013, Mr. Mattingly was seen by podiatry and I was advised by the podiatrist that a sympathetic nerve block procedure was recommended. As this procedure involved risks, including general anesthesia and spinal injections, I called the podiatrist and explained that I believed this procedure to be a last resort in CRPS cases and that I was unaware of any benefit at this time. The podiatrist responded

---

[8] Complex Regional Pain Syndrome. See Doc. 72-3 at 49.

that she would forward literature or evidence of the benefit of this procedure to me, but she never sent me anything. In my professional opinion, I believed that given the evasive nature the potential harm substantially outweighed any potential benefit.[9] Further, any of the UF Health specialists, including podiatry, could have admitted Mr. Mattingly at any time and initiated this treatment as an in-patient procedure.

On September 18, 2013, after Mr. Mattingly was seen by UF Health Neurology and Podiatry, I saw Mr. Mattingly in the PTDF medical clinic. Previously, I had prescribed a drug called Elavil for his pain. On this date, Mr. Mattingly told me that the Elavil was not helping. I offered Mr. Mattingly an increased dose of Elavil, but [he] refused and chose to stop Elavil altogether.[10] I advised Mr. Mattingly that he needed to perform range of motion exercises all of the time, not just at physical therapy, and that the non-usage of his foot was the cause of its deterioration. I prescribed gabapentin for pain, as recommended by UF Health Neurology, and continuance of physical therapy.

On October 2, 2013, PTDF medical staff referred Mr. Mattingly back to UF Health Orthopedics upon UF Health Podiatry's recommendation for a consultation on amputation. Mr. Mattingly was in fact seen on October 11, 2013 by UF Health Orthopedics. According[] to the UF Health medical records, the treating orthopedist advised against amputation in favor of salvaging Mr. Mattingly's left leg and was going to initiate a sympathetic nerve block procedure as alternative treatment. However, the treating orthopedist delayed this procedure until he had reviewed Mr. Mattingly's psychiatric records given his "extensive psychiatric history."

On October 29, 2013, I examined Mr. Mattingly again in the PTDF medical clinic. Mr. Mattingly stated that he did not want to continue taking gabapentin, and that he wanted an

---

[9] See Doc. 72-8 at 15 (treatment note from UF Health Podiatry recommending a sympathetic nerve block; handwritten note on bottom from Defendant Barnes stating, "[zero] referral for elective nerve block - may pursue upon release").

[10] Plaintiff testified that he refused Dr. Barnes' offer to increase the dosage of Elavil. Pl. Dep. (Doc. 72-1) at 239.

amputation. I discontinued the gabapentin prescription at his request and again emphasized the importance of practicing range of motion exercise and activity in his foot and leg.

Two weeks later, on November 14, 2013, I saw Mr. Mattingly again. Mr. Mattingly told me that the pain was worse without the prescriptions for gabapentin and tramadol, and I immediately started same again for administration. I also referred Mr. Mattingly back to UF Health Orthopedics for assessment. Two weeks after this visit, Mr. Mattingly was transferred to Florida State Hospital and out of my medical care from December 2, 2013 through April 2, 2014.

On April 30, 2014, I saw Mr. Mattingly in clinic, and he continued to insist upon an amputation of his leg. I encouraged him to use his leg as a better alternative to amputation, and referred him back to UF Health Orthopedics for evaluation and further recommendations for treatment. Mr. Mattingly was seen two days later by UF Health Orthopedics, which admitted him into the hospital, and a sympathetic nerve block was performed on May 5, 2014. When it was determined that the nerve block was not effective, UF Health Orthopedics had no further recommendations beyond what UF Health Pain Management would recommend.

On May 12, 2014, Mr. Mattingly was returned back to PTDF from UF Health and it was reported that the nerve block had no effect. UF Health Pain Management recommended that Mr. Mattingly keep his leg elevated (which he previously refused to do), noting that when it was elevated during surgery, the swelling decreased significantly. UF Health Pain Management recommended intraspinal procedures (which Mr. Mattingly refused to consider), range of motion exercises as had been ordered all along, and administration of elavil for pain (which Mr. Mattingly previously reported did not help and refused an increased dose). UF Health Pain Management had no further recommendations.

On May 27, 2014, Mr. Mattingly saw UF Health Podiatry which recommended wound care (which was subsequently performed at PTDF under the wound care team), pain management per PTDF medical clinic (Mr. Mattingly was prescribed tramadol), another amputation consult (UF Health

Orthopedics declined further treatment), and a neurosurgery consultation for a neurostimulator (refused by Mr. Mattingly).

After Mr. Mattingly reported no pain relief after the sympathetic nerve block, UF Health Orthopedics signed off on his care noting that an amputation would have no effect if the nerve block had no effect. UF Health Pain Management signed off on his care with recommendations that Mr. Mattingly either refused or had been provided all along. UF Health Podiatry recommended wound care and pain management in accordance with my professional judgment. Mr. Mattingly was still insisting on holding his leg in a dependent position despite recommendations from several physicians to elevate his leg. Accordingly, on May 27, 2014, I ordered elevation of the leg, continued range of motion exercises, and receipt of wound care with no further follow up at UF Health at that time unless requested.

On June 5, 2014, I saw Mr. Mattingly in the PTDF medical clinic, and he again told me that he would not elevate his [leg]. I offered him a leg bolster or a wedge to elevate his leg, and he declined both.[11]

On August 21, 2014, I saw Mr. Mattingly in the PTDF medical clinic and ordered further wound care.

On January 22, 2015, I again saw Mr. Mattingly and he again asked me to refer him to UF Health Orthopedics for an amputation. I counseled him extensively on the importance of using his left foot and leg in order to heal. I told him that physical therapy and rehabilitation are and should be uncomfortable, but that was the only way to regain use of his leg. I reminded him the orthopedic surgeon did not feel there was any indication for amputation and told him that in my personal opinion amputation is crazy and should not be done since he has an intact leg that is capable of regaining physiological function were he willing to do the elevation and

---

[11] Plaintiff acknowledged that he hung his left leg off of his bed every night. See Pl. Dep. (Doc. 72-1) at 226 ("Yes, every night. Every night that I was injured with that leg, that I couldn't keep it in bed because the first couple months I was in a cast, and then after that it was just too dad-gum swollen and painful to put in the bed, I had my leg hanging off the bed.").

rehabilitation. We could not reach an agreement, and Mr. Mattingly still insisted on amputation. Accordingly, I consented to refer him back to UF Health Orthopedics for an evaluation.

The PTDF medical staff does not prescribe narcotic pain medication to inmates except in certain very limited circumstances. First, and most importantly, narcotics are considered highly addictive in the medical community, and are not generally prescribed for treatment of chronic pain. Generally, narcotics are only appropriate if a patient has undergone surgery, has broken a bone, has a terminal illness (such as cancer), or has a debilitating disease like sickle cell anemia. Second, narcotics are used as a commodity in the jail setting despite procedures in place to avoid their trade. Third, it is well established in the medical community that narcotics should not be prescribed to persons with drug abuse history.

I did not prescribe narcotic pain medication to Mr. Mattingly because he had a reported history of drug abuse, specifically opiates, and did not fall into any of the exceptions listed above while I was treating him. The imaging at UF Health never revealed a fracture in his left foot, and even if it did, I would only have prescribed narcotics (if needed) for a very short course.

In accordance with established clinical guidelines for chronic pain control, four non-narcotic categories of pain medication were given: (1) acetaminophen (Tylenol); (2) non-steroidal anti-inflammatories (prescription-strength ibuprofen); (3) anti-depressants (Elavil); and (4) anti-convulsants (gabapentin). At the time that we prescribed tramadol to Mr. Mattingly for pain, it was considered a non-narcotic drug. However, on August 18, 2014, tramadol was classified by the Food and Drug Administration as a narcotic. Tramadol is no longer used for chronic, non-malignant pain in the jail setting.

Mr. Mattingly had alleged that I improperly denied Sohail Khan's recommended neurology consultation at UF Health on October 22, 2014. The referral was denied because (unbeknownst to Mr. Khan) I had already referred him to UF Health Neurology and they had no further recommendations for his treatment.

> I never considered the cost of UF Health's treatment of Mr. Mattingly or referrals to UF Health specialists. I always operated under my own independent professional judgment which never was influenced by the expense of the health care actually provided to Mr. Mattingly while he was treated at PTDF or under UF Health's treatment.
>
> All of the decisions I made regarding Mr. Mattingly's medical treatment were based on my professional medical opinion, my experience, and my medical training. All of the decisions I made were for the purpose of healing Mr. Mattingly's injured leg.

Doc. 72-8 at 2-6 (internal record citations and enumeration omitted).

Plaintiff's complaint that Defendant Barnes did not prescribe him with narcotic pain medication is accurate. Defendant Barnes did not do so for the reasons stated in her Declaration: narcotics are rarely prescribed in the jail setting and in her professional opinion, considering her knowledge of Plaintiff's substance abuse history[12] and current injury, she did not believe narcotic medication was warranted. The Court recognizes that a medical provider's failure to treat an inmate's pain may constitute deliberate indifference. See McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) ("Insofar as [the inmate]'s pain was concerned, a jury could find that the medication provided to [the inmate] was so cursory as to amount to no care at all. A jury could conclude that, despite being aware that the medication prescribed for [the inmate] was not treating the severe pain he was experiencing, [the medical defendants] did nothing to treat [the inmate]'s pain or respond to the deterioration of his condition."). This is not a situation where Defendant Barnes failed to

---

[12] Plaintiff testified that he told medical staff at the jail that he was dependent on opioids. Pl. Dep. (Doc. 72-1) at 162. He also reported to staff that he used cannibis, ecstasy, cocaine, percocet, and hydrocodone. Id. at 163; see also id. at 262.

provide any medication or treatment or failed to attempt to treat Plaintiff's reported pain. She was responsive to Plaintiff's complaints, and Plaintiff acknowledged at his deposition that pain medication was available to him–it just was not the type of medication he desired. <u>See</u> <u>e.g.</u>, Pl. Dep. (Doc. 72-1) at 117-18, 191, 228, 234, 236-37, 239, 251, 255, 258, 262-63, 269-70, 293-94, 297-98. The medical staff at Florida State Hospital prescribed the same pain medication as Plaintiff was prescribed at the jail (tylenol, tramadol, and gabapentin).[13] Plaintiff acknowledged that he refused pain medication at the jail and Florida State Hospital. <u>See</u> <u>id.</u> at 269-70, 280. But he argues that he should have been provided with the narcotic pain medication prescriptions that he was given at UF Health, which sometimes included Norco, Lortab, and percocets. <u>See</u> Pl. Dep. (Doc. 72-1) at 228, 312, 360-61. At bottom, Plaintiff is simply dissatisfied with the medications he received, but his disagreement with Defendant Barnes on her course of treatment based on her medical judgment does not amount to a constitutional violation. <u>See</u> <u>Adams v. Poag</u>, 61 F.3d 1537, 1547 (11th Cir. 1995) (finding that the decision whether to "administer stronger medication . . . is a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983").

Plaintiff's allegation that Defendant Barnes did not refer him to physical therapy is refuted by the contemporaneously created medical records. Plaintiff's cast was removed on July 12, 2013. Doc. 72-5 at 42. On July 30, 2013, Plaintiff was seen by a podiatrist at UF

---

[13] Florida State Hospital has its own procedures and did not blindly follow what was provided to Plaintiff at the jail. <u>See</u> Doc. 72-9 at 10 (Deposition of Patricia Kalu, RNP at Florida State Hospital: "We - - whenever we admit you here [(Florida State Hospital)], we have our own protocol and our own procedures to treat, that's what we go by, by our hospital protocols and treatment, and those are standard procedures that we follow. . . . We cannot go by . . . any standing orders that were given outside of this facility." (emphasis omitted)).

Health. Doc. 72-1 at 442-43 (medical records attached to Plaintiff's Deposition). Under

"Orders" on the podiatrist's treatment note, she wrote: "Neurology consult" and "PT for

CRPS." Id. at 442. That same day, Defendant Barnes referred Plaintiff to physical therapy,

Doc. 72-8 at 11, and he had his initial evaluation with the physical therapist on August 13,

2013, Doc. 72-3 at 77-83.[14] Plaintiff also alleges that Defendant Barnes was deliberately

indifferent when she failed to refer him to neurology based on the podiatrist's

recommendation. Despite Defendant Barnes' initial determination that a neurology referral

was not warranted, less than one month later on August 20, 2013, Plaintiff was referred for

a neurology consultation, and he was seen by neurology on September 16, 2013. Dr.

Bautista, the associate chairman of the neurology department, recommended "pain

management as well as continuing physical therapy." Doc. 72-6 at 2-3. He further

recommended gabapentin. Id. at 3. This brief delay in seeing a neurologist did not result in

any injury, and Defendant Barnes explained her medical reasoning for initially denying the

---

[14] Plaintiff had physical therapy visits on August 27, 2013 (Doc. 72-4 at 27-29); August 29, 2013 (id. at 31-33); September 3, 2013 (id. at 39-41); September 5, 2013 (id. at 42); and September 10, 2013 (id. at 43-45). The physical therapist's note dated October 8, 2013, reflects that Plaintiff did not appear for his appointment that day and that was Plaintiff's second "no-show." Id. at 61. At his deposition, Plaintiff testified that "Joe, the physical therapist, cut [him] lo[o]se after three weeks" because it was "'only getting worse.'" Pl. Dep. (Doc. 72-1) at 121. He also testified that during his stay at Florida State Hospital, he refused physical therapy. Id. at 277-78. But, in his Response, he argues that "he was prevented by the defendants from attending scheduled physical therapy sessions on at least two occasions but probably three." Doc. 76 at 3 (citing Doc. 76-5 at 8 and Doc. 72-4 at 61). The documents cited by Plaintiff do not support an inference that Defendants denied him physical therapy. As noted, the physical therapist's October 8, 2013 note shows that Plaintiff did not appear for his 2:00pm appointment, but other records from Shands appear to reflect that Plaintiff was at Shands that day. Doc. 72-4 at 56-60. Moreover, he states in his Sur-Reply that he refused physical therapy at Florida State Hospital because "the physical therapist agree[d] with the Plaintiff that Physical Therapy would be counter-productive." Doc. 82 at 4.

neurology consult. Defendant Barnes exercising her medical judgment in this regard is not deliberate indifference.

Plaintiff also complains about not receiving orthopedic referrals and further alleges that Defendant Barnes caused a delay in him receiving a nerve block. The records show otherwise. On May 17, 2013, approximately one week after his injury, Plaintiff was seen by Dr. Charles Shaw, an orthopedic surgeon at UF Health. Doc. 72-4 at 128; <u>see</u> Doc. 72-5 at 26-29. Plaintiff's foot was x-rayed again, Doc. 72-3 at 43-47, and Dr. Shaw indicated that there was "no displacement of the bones" and Plaintiff was "going to be maintained in a bulky compressive dressing with posterior splint and return for followup evaluation in three or four weeks." Doc. 72-4 at 128. Dr. Shaw saw Plaintiff again on July 19, 2013; he reviewed Plaintiff's MRI scan and ordered a venous Doppler. Doc. 72-1 at 439 (medical record attached to Plaintiff's Deposition). On July 26, 2013, Dr. Shaw followed-up with Plaintiff, acknowledged that the venous Doppler was negative for DVT, and stated, "Because of his continued symptoms and lack of a diagnosis that would explain this constellation of findings, I am going to have the foot and ankle group see him in their clinic." Doc. 72-1 at 441 (medical record attached to Plaintiff's Deposition). As previously noted, Plaintiff was seen by a podiatrist four days later on July 30, 2013. Doc. 72-1 at 442-43 (medical record attached to Plaintiff's Deposition).

A clinical note dated October 11, 2013, and signed by Dr. Shaw and Dr. Loren Hudspeth states:

> Mr. Mattingly is a 28-year-old male who sustained a fall approximately 6 months ago resulting in an ankle injury. After the injury, he complained of increased pain and decreased motion, as well as increased sensitivity, cold toes, nerve pain,

17

muscle twitches, and swelling. There are no relieving factors, and the pain is exacerbated by any movement or touch. The patient also states that he has seen multiple doctors in the past 6 months with varying diagnoses and has yet to find anything that helps. Mr. Mattingly was seen on Tuesday of this week at Jail Clinic by Dr. Berrey, Ortho Oncology. At that time, we discussed with him what we thought was a likely diagnosis of complex regional pain syndrome. The patient initially stated that he wanted to have an amputation immediately. Dr. Berrey explained to him[] the treatment options and his desire for limb salvage with a pain catheter in hopes of decreasing the sympathetic reaction. Patient is agreeable to trying the pain catheter and limb salvage at this time. The patient has an extensive psychiatric history with dissociative identity disorder and multiple mood disorders diagnosed by various physicians. He is currently seeing Dr. Kao in the jail. Dr. Berrey has requested that he release this information to him so that he can help collaborate with his psychiatric doctor. At this time, we have obtained authorization of release, and plan to see Mr. Mattingly back in Jail Clinic next Friday. **In the mean[]time we will discuss plan with Anesthesia to get pain catheter placed and have the patient admitted for treatment.**

Doc. 72-4 at 119 (emphasis added). Dr. Shaw saw Plaintiff the following week on October 18, 2013. See Doc. 72-1 at 478 (medical record attached to Plaintiff's Deposition). He acknowledged that Plaintiff was "becoming increasingly frustrated with the condition of his leg," and that "Dr. Berrey is pursuing, considering management of this problem and the various modalities are being evaluated. We were waiting for his psychiatric evaluation. That came through this morning and will be delivered to Dr. Berrey by me." Id. at 478.

In a progress note dated May 2, 2014, Dr. Hudspeth wrote:

Mr. Mattingly is a 29-year-old male who sustained a fall with a cuneiform fracture approximately 1 year ago and has since developed complex regional pain syndrome. He has been seen in Jail Clinic multiple times for this issue including discussions with Dr. Berrey in regard to amputation. He is actively requesting amputation and has been for the past 6 months. Dr. Berrey has explained to him treatment options which would

18

include a sympathetic nerve block prior to attempting amputation. **The patient was lost to followup for approximately 5 months due to being transferred to a Tallahassee Jail.** The patient is here today again requesting amputation and/or follow up of the sympathetic block.

I discussed the case with Dr. Matt Warrick and Dr. Kumar of Anesthesia. Dr. Kumar would like the patient to be admitted to the hospital or TCU on Monday to undergo series of sympathetic blocks to that left lower extremity. **I will call the hospitalist to attempt to arrange admission for Mr. Mattingly.**

Doc. 72-4 at 118 (emphasis added). The "Tallahassee Jail" referred to by Dr. Hudspeth in this note is actually Florida State Hospital. The state circuit court ordered that Plaintiff be sent to Florida State Hospital for evaluation prior to his criminal trial. He remained at Florida State Hospital from about December 3, 2013 to about April 1, 2014. See Pl. Dep. (Doc. 72-1) at 259-61; Doc. 72-2 at 4-7 (medical records attached to Plaintiff's Deposition); Doc. 72-6 at 40.

Insofar as Plaintiff contends that Defendant Barnes caused a delay in him receiving the nerve block, she explained her medical reasoning for initially denying the podiatrist's recommendation for a sympathetic nerve block in September 2013. However, the following month, UF Health Orthopedics planned to arrange for a pain catheter after reviewing Plaintiff's mental health records. Shortly thereafter, through no fault of Defendant Barnes, Plaintiff was transferred to Florida State Hospital, and "was lost to followup for approximately 5 months." Doc. 72-4 at 118. Notably, he received a nerve block on May 7, 2014, about one month after he returned to the jail. See Doc. 72-4 at 99-101. The records support a finding

that the alleged delay in receiving the nerve block was a result of Plaintiff's transfer to Florida State Hospital.[15]

After the nerve block, in May 2014, UF Health Orthopedics and Pain Management signed off on Plaintiff's care:

> Patient received no benefit from sympathetic block performed by Dr. Kumar. Per Dr. Kumar diagnosis of CRPS is unlikely at this point. Intraoperative findings showed that when leg not held in dependent position there was significant reduction in erythema and swelling to LLE. Discussed the case further with Dr. Berrey and Dr. Kumar, **at this time there is no further orthopaedic intervention warranted as amputation is unlikely to benefit**.[[16]] We recommend patient pursue complete diagnostic evaluation with Dr. Kumar. Patient continues requesting amputation and asks if there are other doctors that will do it. Patient is encouraged to get second opinion regarding amputation.

Doc. 72-2 at 12 (May 9, 2014 medical record signed by Drs. Hudspeth and Berrey, UF Health Orthopedic Surgery) (emphasis added).

> 29 yr. [o]ld male with left leg and foot edema and pain as well as subjective loss of function. All the criteria for the diagnosis of CRPS type 1 not met. He had a negative response to the diagnostic lumbar sympathetic block. He wants his leg

---

[15] Dr. Rogozinski was asked whether a delay from October 2013 to May 2014 in performing the sympathetic nerve block caused Plaintiff any harm or worsened his condition. Dr. Rogozinski answered: "In view of the fact that Mr. Mattingly received no benefit from the sympathetic nerve block, and that he did not have CRPS, the delay in treatment did not cause him any harm nor did it worsen his condition." Doc. 72-13 at 3 (emphasis omitted).

[16] A record from Florida State Hospital shows that Plaintiff had a consultative examination on March 27, 2014, and the physician wrote: "opinions [at] Shands, Jacksonville Ortho + from Dr. Hoyne, Vascular Surgeon in Tallahassee that [left below knee] amputation is best. That is what he wants." Doc. 76-7 at 2 (some capitalization omitted). This report is contradicted by the report from UF Health Orthopedics dated May 9, 2014, stating that "there is no further orthopaedic intervention warranted as amputation is unlikely to benefit." Doc. 72-2 at 12 (medical record attached to Plaintiff's Deposition transcript).

amputated inspite of understanding the risks involved. Discussed the options of getting a lumbar spine MRI without contrast to rule out any nerve root impingement or spinal stenosis which can explain his symptoms. Strongly recommend elevation of left lower extremity to decrease dependent edema. Discussed spinal cord stimulation, epidural/transforaminal steroid injection. Patient not willing to have any intraspinal procedures done at this time.[17] Strongly recommend active/passive ROM of his left ankle, metatarsals and phalangeal joints to prevent fibrosis. Can also try Amitryptiline/Nortriptyline 25-50 mg po qhs to see it[]s response in the neuropathic pain symptoms along with lyrica.

**No further recommendations.**

Id. at 13 (May 8, 2014 medical record signed by Dr. Kumar, UF Health Pain Management[18]) (emphasis added).[19] Other than seeing UF Health Podiatry on May 27, 2014, Plaintiff's medical care was thereafter provided at the jail. In January 2015, Defendant Barnes consented to refer Plaintiff back to an orthopedic surgeon to re-evaluate him. Doc. 72-6 at 247, 249-50. In February 2015, Plaintiff was admitted to the hospital and his amputation was performed.

Defendant Barnes' decisions on whether and when to refer Plaintiff to a specialist are medical judgments. See Boone v. Gaxiola, 665 F. App'x 772, 774 (11th Cir. 2016) ("A medical decision not to pursue a particular course of diagnosis or treatment is a classic

_____

[17] Plaintiff acknowledged that Dr. Kumar recommended other treatment options, but Plaintiff declined because he had "a leg problem, not a back problem." Pl. Dep. (Doc. 72-1) at 292; see also id. at 293.

[18] See Doc. 72-4 at 100 (Dr. Kumar - Pain Management).

[19] At deposition, Plaintiff testified that the nerve block "worked partially, not entirely. Several hours it actually worked," but "[i]t was supposed to last for several days." Pl. Dep. (Doc. 72-1) at 288.

example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment."). At most, Plaintiff has shown a disagreement with Defendant Barnes' course of treatment. The record is replete with medical examinations and treatment records by staff at the jail and UF Health. Plaintiff's disagreement with the treatment he was provided is not a constitutional violation. See Melton v. Abston, 841 F.3d 1207, 1224 (11th Cir. 2016) ("'[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)).

Finally, there is nothing in the record to support Plaintiff's contention that he was denied medical care based on cost. Defendant Barnes and Ms. Wildes, the former Director of Corrections for the Jacksonville Sheriff's Office, both affirmed that cost was never a factor that was considered in providing inmates medical care at the jail. Ms. Wildes states that "[t]he cost of medical services provided to JSO inmates by UF Health was never a determining factor as to whether an inmate was transferred to UF Health for necessary treatment. The cost of inmate medical treatment at UF Health was covered by the City of Jacksonville's indigent care contract with UF Health, and such cost never impacted the budget of JSO's Department of Corrections." Doc. 72-10 at 2-3. Plaintiff received treatment from several different specialists at UF Health on numerous occasions. His contention that he was denied treatment because "JSO would not pay" is not supported by the record.

Considering the record on the whole, and viewing the facts in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that Defendant Barnes was deliberately indifferent to Plaintiff's serious medical needs. The objective medical

evidence reflects that Defendant Barnes' course of treatment was appropriate and certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Rogers</u>, 792 F.2d at 1058 (citation omitted). She is due to have summary judgment entered in her favor.

### B. Defendant Richo

Plaintiff claims in the Third Amended Complaint that Defendant Richo "refused to issue prescribed medication from UF Health, and has told the Plaintiff that she would not refer him for speciality consultation." Plaintiff testified at his deposition that Defendant Richo failed to change his pain medication to "something that works" when he requested it, and she failed to send him for podiatry and neurology[20] consults after speaking with the discharge physician at UF Health on May 12, 2014. <u>See</u> Pl. Dep. (Doc. 72-1) at 332-34.

The following timeline is relevant to Plaintiff's claims against Defendant Richo:

- On May 10, 2013, the day after Plaintiff's initial injury, Plaintiff returned from Shands and was seen by medical staff at the jail. Doc. 72-5 at 14. He was seen again later that morning by Defendant Richo. <u>Id.</u> at 15; Doc. 72-7 at 2. Defendant Richo prescribed ibuprofen and referred Plaintiff to UF Health Orthopedics. Doc. 72-5 at 15; Doc. 72-7 at 2.

- On June 25, 2013, Defendant Richo examined Plaintiff. She prescribed Tylenol and referred him to UF Health Orthopedics. Doc. 72-7 at 3, 8.

- On August 21, 2013, Plaintiff advised Defendant Richo that he heard a "pop" in his injured foot, and Defendant Richo immediately sent Plaintiff to the UF Health Emergency Department for evaluation and treatment. Doc. 72-7 at 3, 9.

- On September 5, 2013, Defendant Richo prescribed tramadol,[21] ibuprofen, and antibiotics (for possible infection). Doc. 72-7 at 3, 10-11.

---

[20] As shown below, the recommended referrals were to pain management and podiatry.

[21] Tramadol was not considered a narcotic until August 18, 2014. Doc. 72-7 at 3.

- From about December 3, 2013 to about April 1, 2014, Plaintiff was at Florida State Hospital. <u>See</u> Pl. Dep. (Doc. 72-1) at 259-61; Doc. 72-2 at 4-7 (medical records attached to Plaintiff's Deposition); Doc. 72-6 at 40.

- On May 12, 2014, Defendant Richo spoke to a discharge physician at UF Health and upon that physician's recommendation, Defendant Richo referred Plaintiff to UF Health Podiatry and Pain Management. Defendant Richo continued Plaintiff's tramadol prescription and instructed Plaintiff to keep his foot elevated. Doc. 72-7 at 3, 13-25.

- On May 19, 2014, Defendant Richo saw Plaintiff for a follow-up visit; she continued the tramadol prescription. Doc. 72-7 at 3, 26.

- On December 2, 2014, Defendant Richo referred Plaintiff to wound care, and she discontinued the gabapentin but continued Tylenol. Doc. 72-6 at 163.

- On February 9, 2015, Defendant Richo saw Plaintiff. She referred him to wound care for management. Doc. 72-6 at 283.

Plaintiff's complaint that Defendant Richo failed to refer him to specialists after he was discharged from UF Health in May 2014 is contradicted by the contemporaneously created medical records. A record dated May 12, 2014, signed by Defendant Richo states: "Received call from Dr. Vegesma at Shands that Mr. Mattingly will be returning from Shands today. P[atient] will need referral to pain management and podiatry and to keep leg elevated." Doc. 72-7 at 13; <u>see</u> Doc. 72-4 at 112 (record of Dr. Vegesma stating that she requested Defendant Richo "make sure patient follows up with podiatry and pain management as out patient"). When Defendant Richo saw Plaintiff that day, she prescribed Tramadol and referred him to "[p]odiatry and pain management as recommended by Shands." Doc. 72-7 at 14; <u>see id.</u> at 15-25. Defendant Richo completed the requested referrals, and Plaintiff was seen by UF Health Podiatry on May 27, 2014. Doc. 72-4 at 117. Pain Management, however, had already signed off on Plaintiff's care. <u>See</u> Doc. 72-2 at 13 (medical record

attached to Plaintiff's Deposition).[22] Despite Plaintiff's allegation to the contrary, Defendant Richo completed the referrals that were recommended by Dr. Vegesma at Shands; therefore, she could not be deemed deliberately indifferent for this reason.

Plaintiff's complaint that Defendant Richo did not provide him with the medication prescribed by UF Health or change his medication to "something that works" does not rise to the level of a constitutional violation. Defendant Richo avers that she "did not prescribe narcotic pain medication" after Plaintiff's injury "because in [her] professional opinion narcotics were not a proper treatment given Mr. Mattingly's reported history of drug abuse and the fact that the x-ray imaging revealed no fracture." Doc. 72-7 at 2-3. As previously discussed, just because Plaintiff desired a different medication does not mean that Defendant Richo was deliberately indifferent in failing to comply with his requests. See Adams, 61 F.3d at 1547.

Considering the record on the whole, and viewing the facts in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that Defendant Richo was deliberately indifferent to Plaintiff's serious medical needs. The record shows that Defendant Richo provided Plaintiff with at least "minimally adequate medical care." Harris, 941 F.2d at 1504 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Thus, she is due to have summary judgment entered in her favor.

---

[22] A record dated June 5, 2014 shows that Plaintiff saw Defendant Barnes at the jail, and Defendant Barnes advised him that he had no consults pending because "there are no pain med specialists available and since surg has already declined to amputate his leg and since neurosurg is also not planning any interventions since the CRPS diagnosis is not consistent with his presentation." Doc. 72-6 at 100.

C. Defendant Khan

Plaintiff's main complaint against Defendant Khan stems from an encounter on April 9, 2014. See Pl. Dep. (Doc. 72-1) at 358-59. Upon Plaintiff's return to the jail from the hospital, Plaintiff was seen by Defendant Khan. According to Plaintiff, Defendant Khan "took the Plaintiff's crutches from him and told him to 'crawl his ass back to his dorm.'" Plaintiff alleges that Defendant Khan "threatened to taze the Plaintiff if he didn't comply."

In a medical record dated April 9, 2014 at 6:37am, Defendant Khan wrote:

> S: pt. return from ER at 4 am. pt. standing and talking to other inmates. he was asked to move aside and sit on the vital's chair. he refused. he rudely shoos me away, "i am fine." he was asked to sign a refusal. he was observed using the crutches as tooth picks and pacing away. At this point, I asked the officers to take his crutches. he goes to the pod window and stands there for more than 30 min. "i can't walk." Searge asked him to come back for an eval. His white armband is blank and the crutches have no name on it. per ER NO fracture NO DVT
>
> O: pt. rude, argumentative and uncooperative. "you got to give me my pills from the hospital." he was educated i cannot write narcotics. Searge calms him down and now he cooperates a little. he tells me he thought he had a DVT, at the same time his LLE problem is ongoing more than 2 years. NO SOB, NO CP, NO upper thigh swelling. LLE +1 edema, nonpitting, rubor in color. he was wearing a soft boot. heart/lungs not done b/c pt. hostile.
>
> A: RSD
>
> P: no need for ortho f/u this is ongoing. he already has Rx Gabapentin and Tylenol. no need for more meds. NO f/u. Crutches given back and ok to keep soft boot. White arm ban[d] given.

Doc. 72-6 at 64. Defendant Khan explains that at the time of this encounter, "normal jail protocol required that inmates returning from a medical referral are required to follow-up with

the medical personnel who are on duty" and "that any medical equipment, including crutches, be checked into the jail with a proper label." Doc. 72-12 at 3; see also Pl. Dep. (Doc. 72-1) at 367 ("Whenever you come back from M2, you have to do a follow-up with a doctor . . . or whoever's on duty. You have to follow up with them, and they go through any orders, any treatment plans, housing changes."). Because Plaintiff's crutches did not have a label, Defendant Khan states that he "prepared and attached an appropriate label to them." Doc. 72-12 at 3; see Pl. Dep. (Doc. 72-1) at 372 (Plaintiff testifying at his deposition that he "didn't have a bracelet on and . . . the crutches didn't have the bracelet on them").

First, as to Plaintiff's allegation that Defendant Khan threatened to "taze" him, verbal threats and harassment are generally not actionable under § 1983. See Hernandez v. Florida Dep't of Corr., 281 F. App'x 862, 866 (11th Cir. 2008) (finding that the plaintiff's "allegations of verbal abuse and threats by the prison officers did not state a claim because the defendants never carried out these threats and verbal abuse alone is insufficient to state a constitutional claim" (citation omitted)); see also McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983) (recognizing that "'mere threatening language and gestures of a custodial office do not, even if true, amount to constitutional violations'"). Plaintiff's description of Defendant Khan's actions, if true, may cause one to believe Defendant Khan was rude or unprofessional, but such actions do not amount to a constitutional violation.

Second, regarding Plaintiff's allegation that Defendant Khan took his crutches from him, perhaps most importantly, Plaintiff has not shown how he was injured by Defendant Khan's actions. The entire encounter between Plaintiff and Defendant Khan lasted about "an hour and 15 minutes or so." Pl. Dep. (Doc. 72-1) at 374. Plaintiff was not standing that entire

time nor was he without his crutches that entire time. Id. at 370-71 (Plaintiff's deposition: "[Sergeant Peterson] went and talked to Mr. Khan. . . . Peterson came back out with my crutches and told me to come back here. So I come back and I sit back down in the chair."). To the extent Plaintiff alleges Defendant Khan engaged in negligent conduct, the law is well settled that the Constitution is not implicated by the negligent acts of prison officials. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); see Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). There is nothing in the record to support a finding that Defendant Khan temporarily depriving Plaintiff of his crutches caused or contributed to Plaintiff's injury or worsened his condition. Thus, Plaintiff's claim in this regard fails.

Third, Plaintiff alleges that Defendant "Khan refused to issue prescribe[d] medication from UF Health and told other nurses to avoid talking with the Plaintiff." It has been established that the jail did not routinely provide narcotic pain medication, but that Plaintiff was consistently provided with non-narcotic pain medication. He is not entitled to a particular medication and his requests for specific medications amount to no more than a disagreement with medical staff as to the appropriate course of treatment–not a constitutional violation. Additionally, the medical records reflect that on July 24, 2014, Defendant Khan wrote, "pt verbally agreed to comply with wound care. pls see him, but do not speak to him if possible. thx." Doc. 72-6 at 114.[23] At his deposition, Plaintiff stated that

---

[23] By that time, Defendant Khan apparently knew that Plaintiff was suing him. Doc. 72-6 at 107 (Defendant Khan's treatment note: "Please schedule for a provider visit for tomorrow to follow up on drainage from his left leg wound. . . . [S]ent me a letter he is suing me. I will

by this written statement, Defendant Khan "prejudiced other individuals against" him but "they didn't go for it. They still conversed with me. . . . So when they went through that whole episode there and he told them not to speak to me and put it in the medical record, . . . they disregarded that and had a friendly conversation anyhow." Pl. Dep. (Doc. 72-1) at 366. Again, even if Defendant Khan's behavior can be considered unprofessional, it is not unconstitutional. Notably, Defendant Khan requested that Plaintiff still be seen by medical providers. Plaintiff has not shown how he was injured by Defendant Khan's actions in telling other medical staff to see Plaintiff but not to speak to him if possible.

Considering Plaintiff's allegations against Defendant Khan on the whole, the Court finds that Defendant Khan is entitled to summary judgment. Given the evidence submitted and viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that Defendant Khan violated Plaintiff's constitutional rights.

## VII. Conclusion

The medical records show that Plaintiff received consistent and adequate medical evaluation and treatment. His complaints about specific instances of alleged inadequacies do not amount to constitutional violations by themselves or on the whole. And even more, his allegations fail to take into account the whole picture. Plaintiff was not only being seen by these three Defendants. Rather, the records show that Plaintiff received medical care and treatment from several different providers at the jail, UF Health, and Florida State Hospital. Even considering the facts in the light most favorable to Plaintiff, he cannot establish that Defendants' actions or inactions violated the Fourteenth Amendment.

_____

not see him.").

The Constitution does not require that Plaintiff be afforded the exact type of medical care and treatment he requests. On the contrary, he is only entitled to "minimally adequate medical care." Harris, 941 F.2d at 1504 (citation omitted). He received more than that.[24] And although he "may personally believe that he should have been treated differently, his personal disagreement with the treatment administered by [the Defendants] is 'a classic example of a matter for medical judgment'—not a constitutional violation." Rutledge v. Alabama, No. 16-16083, 2018 WL 705642, at *5 (11th Cir. Feb. 5, 2018) (unpublished) (quoting Adams, 61 F.3d at 1545).

It is

**ORDERED**:

1.      Defendants' Motions for Summary Judgment (Docs. 70, 71) are **GRANTED**.

2.      Plaintiff's Motion (Doc. 73) is **DENIED** to the extent he seeks the appointment of counsel and **DENIED as moot** to the extent he requests additional time to respond to the summary judgment motions.

3.      The Clerk shall enter judgment in favor of Defendants and against Plaintiff and thereafter close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 27th day of March, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

---

[24] This conclusion is not only supported by the medical records and the Defendants' declarations, but also by the expert opinions submitted by Drs. Rogozinski (Doc. 72-13) and Abrams (Doc. 72-14).

JAX-3 3/22
c:
Casey Mattingly
Counsel of Record